IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 1:21-CR-118 (TSE) |
| v. | COUNT ONE:<br>Conspiracy To Commit Wire Fraud and<br>Bank Fraud<br>(18 U.S.C. § 1349) |
| BRETT A. AMENDOLA | |
| and | COUNTS TWO THROUGH SEVEN:<br>Wire Fraud<br>(18 U.S.C. § 1343) |
| ROGER AMENDOLA, | |
| Defendants | COUNTS EIGHT AND NINE:<br>Bank Fraud<br>(18 U.S.C. § 1344) |
| | COUNTS TEN THROUGH THIRTEEN:<br>False Statements to a Financial<br>Institution<br>(18 U.S.C. § 1014) |

## SUPERSEDING INDICTMENT

November Term 2021 – At Alexandria

THE GRAND JURY CHARGES THAT:

### GENERAL ALLEGATIONS

#### INTRODUCTION

At all times material to this Superseding Indictment:

1.     Defendant BRETT A. AMENDOLA lived in Loudoun County, Virginia, in
the Eastern District of Virginia.  Defendant ROGER AMENDOLA lived in Ashburn,
Virginia, in the Eastern District of Virginia.  ROGER AMENDOLA is BRETT A.
AMENDOLA's father.

2.      As discussed below, from at least in or about April 2017 through August 2020,[1] BRETT A. AMENDOLA and ROGER AMENDOLA used numerous bank, brokerage, and other financial accounts opened under several different names to defraud various individuals by what is known as a *Ponzi* scheme." As part of the scheme, the defendants obtained money from their victims with the knowingly false and fraudulent promises that the victims would receive quick repayment and large rates of return on the victims' investments with BRET A. AMENDOLA.  The defendants also made various false statements to their victims concerning how the victims' money would be used.

3.      Contrary to the defendants' promises to the victims, the defendants used money they obtained from later victims to make partial payments to earlier victims, by which the defendants sought to lull the victims into a false sense of security in the soundness of their investments.  When victims complained to the defendants about BRETT A. AMENDOLA's failure to repay them as promised, the defendants made various lulling statements to the victims concerning the state and profitability of the victims' investments and continued to make partial payments to some victims with money obtained from other victims.

4.      Contrary to the defendants' promises to their victims, BRETT A. AMENDOLA also used the victims' money to pay his personal expenses; to gamble at various casinos; to pay for a 2017 Porsche Panamera; to pay rent for an expensive home in Leesburg, Virginia; to make high-risk investments that were other than what the

---

[1] All dates subsequently alleged in this Superseding Indictment occurred on or about those dates.  All amounts alleged in this Superseding Indictment are approximate.

defendants had promised to their victims; and as mentioned, to make lulling payments to earlier victims of the *Ponzi* scheme.

5.      Company #1 was an entity registered with the Virginia Corporation Commission in the Eastern District of Virginia by ROGER AMENDOLA on July 12, 2019.

6.      Company #2 was a construction company that was owned by ROGER AMENDOLA and that was located in Ashburn, Virginia, in the Eastern District of Virginia.

7.      Company #3 was a shell corporation incorporated in Virginia on February 8, 2017. BRETT A. AMENDOLA was a manager of Company #3. One of the defendants' relatives ("the Relative") was Company #3's director, president, treasurer, and secretary.

8.      Company #4 was a shell corporation incorporated by the Relative on April 26, 2017. Its website was registered by BRETT A. AMENDOLA. The 2017 Porsche Panamera that BRETT A. AMENDOLA drove was titled in the name of Company #4. The Porsche Panamera was purchased in or around June 2017 for $103,971 with a $93,091 loan fraudulently obtained from M&T Bank. ROGER AMENDOLA was a co-applicant on the M&T Bank loan and identified himself as Company #4's director on the vehicle's purchase and loan records. BRETT A. AMENDOLA and ROGER AMENDOLA defaulted on the M&T Bank loan.

9.      As discussed below, BRETT A. AMENDOLA and ROGER AMENDOLA used Company #2 and Company #1 to obtain fraudulent loans through the Paycheck Protection Program, which was part of the Coronavirus Aid, Relief, and Economic Security Act. The Program provided, among other things, forgivable loans to small businesses so that they could meet their payrolls and retain their employees. To obtain

the fraudulent loans, BRETT A. AMENDOLA and ROGER AMENDOLA lied to the lender about, among other things, the number of employees that Company #2 and Company #1 employed and the amount of the entities' payroll. BRETT A. AMENDOLA used some of the proceeds from the loans to make partial payments to some of the victims of the *Ponzi* scheme.

### THE PONZI SCHEME

The victims of the defendants' *Ponzi* scheme included the following:

#### *Victim #1*

10.     BRETT A. AMENDOLA falsely and fraudulently promised Victim #1 that if Victim #1 invested with BRETT A. AMENDOLA he would match Victim #1's investments dollar-for-dollar and that he would deposit all of the funds into a trading account from which BRETT A. AMENDOLA would trade financial instruments. BRETT A. AMENDOLA falsely and fraudulently promised that he would give Victim #1 access to the trading account and that Victim #1 would receive distributions from the trading account that matched any distributions taken by BRETT A. AMENDOLA.

11.     Victim #1 wired BRETT A. AMENDOLA $10,000 on October 30, 2018, $10,000 on October 31, 2018, and $5,000 on November 1, 2018. TD Bank Account #1, which received the wires, had an opening balance of $0.50 the day the first wire was received.

12.     Of the $20,000 that Victim #1 wired to BRETT A. AMENDOLA on October 30 and 31, 2018, $11,500 was wired to ROGER AMENDOLA's Charles Schwab Account. That month, BRETT A. AMENDOLA lost $31,000 in ROGER AMENDOLA's Charles Schwab Account through risky trading in complex securities.

13.     Between November 4 and November 19, 2018, BRETT A. AMENDOLA gambled thousands of dollars at the Hollywood Casino at Charles Town Races.

14.     On November 26, 2018, Victim #1 gave BRETT A. AMENDOLA an additional $14,500 via PayPal because BRETT A. AMENDOLA falsely and fraudulently claimed that he needed the money immediately to cover an options trade that he had executed.  TD Bank Account #2, which received the PayPal deposit, had an opening balance of $161 the day the deposit was received.

15.     Between November 29, 2018, and December 6, 2019, BRETT A. AMENDOLA gambled thousands of dollars at the Hollywood Casino at Charles Town Races.

16.     Of the $14,500 Victim #1 gave BRETT A. AMENDOLA via PayPal on November 26, 2018, $7,000 was wired to ROGER AMENDOLA's Charles Schwab Account.  That month, BRETT A. AMENDOLA lost $59,000 in ROGER AMENDOLA's Charles Schwab Account through risky trading in complex securities.

17.     On January 23, 2019, Victim #1 gave BRETT A. AMENDOLA an additional $9,000 via PayPal and a $14,000 check because BRETT A. AMENDOLA again falsely and fraudulently claimed that the money was needed immediately to cover an options trade.  SunTrust Account #1, which received the PayPal deposit, had an opening balance of $2,490 the day the PayPal deposit was received.

18.     Between January 22 and January 24, 2019, BRETT A. AMENDOLA gambled thousands of dollars at the Hollywood Casino at Charles Town Races.  During January 2019, BRETT A. AMENDOLA also gambled thousands of dollars at the MGM National Harbor Casino.

19.     Despite BRETT A. AMENDOLA's promise to deposit the funds in a joint trading account and make a matching deposit, BRETT A. AMENDOLA failed to do so. In fact, BRETT A. AMENDOLA never opened an investment account with Victim #1 as an owner.  Instead, $19,000 of Victim #1's funds were comingled with other victims' funds in ROGER AMENDOLA's Charles Schwab Account, while the rest – more than $43,000 – was diverted to other purposes.  For example, BRETT A. AMENDOLA used much of Victim #1's money to pay third parties and to pay $4,600 to the owner of the home BRETT A. AMENDOLA was renting.  BRETT A. AMENDOLA also converted $29,700 of Victim #1's investment into cash.  BRETT A. AMENDOLA never made any deposits to match the investments made by Victim #1.

20.     BRETT A. AMENDOLA never provided Victim #1 with access to a trading account.  BRETT A. AMENDOLA falsely and fraudulently told Victim #1 that he was transferring the account from TD Ameritrade to Interactive Brokers and that he would provide Victim #1 the login information after the transfer was completed.  BRETT A. AMENDOLA repeatedly delayed providing Victim #1 with login information for the supposed account, including by giving Victim #1 false login information.

21.     BRETT A. AMENDOLA made various false lulling statements to Victim #1. For example, on November 28, 2018, BRETT A. AMENDOLA sent an email to Victim #1 falsely and fraudulently claiming that BRETT A. AMENDOLA was "just playing it safe." On November 29, 2018, BRETT A. AMENDOLA sent an email to Victim #1 falsely and fraudulently saying "I want to stick with being conservative. Let's play the week out and wait until Monday. Paying these huge premiums seems like too big a risk."  On December 11, 2018, BRETT A. AMENDOLA sent Victim #1 emails falsely and

-6-

fraudulently saying that BRETT A. AMENDOLA was "taking a conservative and patient approach" and "we are up $2900."

*Victim #2*

22.     In late 2018, BRETT A. AMENDOLA falsely and fraudulently told Victim #2 that he had an "amazing opportunity" involving a hemp farm located in Maryland. BRETT A. AMENDOLA told Victim #2 that if she lent him $50,000 on a Monday, he would repay her $70,000 by Thursday.  BRETT A. AMENDOLA told Victim #2 that he needed to borrow $50,000 because he had to demonstrate that he had this much to invest in the farm.  Victim #2 also lent BRETT A. AMENDOLA money for a beverage company that he said he was starting.

23.     BRETT A. AMENDOLA received $134,550 from Victim #2.  Although BRETT A. AMENDOLA eventually "repaid" Victim #2 eighteen months later, the money BRETT A. AMENDOLA gave her included money provided by other unwitting victims of the defendants' *Ponzi* scheme.

24.     In or about November 2018, rather than applying Victim #2's funds as promised, BRETT A. AMENDOLA caused the following transactions, among others, on the dates below:

      a.    On November 15, 2018, Victim #2 wired $58,000 to TD Bank Account #1;

      b.    On the same day:

          i.    The opening balance of TD Bank Account #1 was $560;

          ii.    A $10,000 check BRETT A. AMENDOLA wrote payable to Victim #11 cleared TD Bank Account #1; and

          iii.    BRETT A. AMENDOLA sent two wires totaling $35,000 from TD Bank Account #1 to ROGER AMENDOLA's Charles Schwab Account.

c.    On November 27, 2018, Victim #2 wired $13,000 to TD Bank Account #1;

d.    On the same day:

          i.    The opening balance of TD Bank Account #1 was $467;

          ii.    BRETT A. AMENDOLA wired $10,000 from TD Bank Account #1 to ROGER AMENDOLA's Charles Schwab Account;

          iii.    BRETT A. AMENDOLA made a $2,000 cash withdrawal from TD Bank Account #1.

e.    During November 2018, BRETT A. AMENDOLA gambled thousands of dollars at the Hollywood Casino at Charles Town Races, as mentioned above;

f.    During November 2018, BRETT A. AMENDOLA lost $59,000 in ROGER AMENDOLA's Charles Schwab Account through risky trading in complex securities.

25.    In or about December 2018, BRETT A. AMENDOLA caused the following transactions, among others, on the dates below:

a.    On December 19, 2018, Victim #2 wired $30,000 to TD Bank Account #1, which had an opening account balance of negative $446 on December 19, 2018;

b.    On the same day, a $7,500 check BRETT A. AMENDOLA wrote payable to Victim Entity #4 cleared TD Bank Account #1;

c.    On the next day, December 20, 2018:

    i.    BRETT A. AMENDOLA transferred $29,000 from TD Bank Account #1 to TD Bank Account #2;

    ii.    BRETT A. AMENDOLA transferred $28,500 from TD Bank Account #2 to TD Bank Account #3, which had a balance of $0.03 prior to the transfer;

    iii.    BRETT A. AMENDOLA wired $5,000 to Victim #10 from TD Bank Account #3;

    iv.    BRETT A. AMENDOLA wired $5,700 to Victim Entity #1 from TD Bank Account #3;

    v.    BRETT A. AMENDOLA wired $16,500 to ROGER AMENDOLA's Interactive Brokers Account #1 from TD Bank Account #3; and

    vi.    ROGER AMENDOLA wrote a $50,000 check to Victim #2 from Wells Fargo Account #3, which had a balance of $904 immediately before the $50,000 check cleared and of negative $49,095 immediately afterwards.

d.    On December 24, 2018, Victim #2 wired $31,000 to TD Bank Account #2, which had a balance of $1,096 prior to receiving the wire;

e.    Two days later, on December 26, 2018:

    i.    BRETT A. AMENDOLA wired $6,000 to Victim Entity #1 from TD Bank Account #2; and

    ii.    BRETT A. AMENDOLA wired $18,000 from TD Bank Account #2 to ROGER AMENDOLA's Interactive Brokers Account #1, which had been opened on December 14, 2018.

f.    Interactive Brokers Account #1 had a closing balance of $62,347 on December 31, 2018, but BRETT A. AMENDOLA lost more than $89,000 through risky trading in complex securities during January 2019, which left Interactive Brokers Account #1 with a balance of $30 on January 31, 2019; and

g.    During December 2018, BRETT A. AMENDOLA lost more than $11,000 in ROGER AMENDOLA's Charles Schwab Account through risky trading in complex securities. This left a balance in the account of less than $2.00.

26.    During November and December 2018, BRETT A. AMENDOLA gambled thousands of dollars at the Hollywood Casino at Charles Town Races, as mentioned above. During January 2019, BRETT A. AMENDOLA gambled thousands of dollars at the MGM National Harbor Casino, as mentioned above.

27.    On January 29, 2019, the Relative left the following voicemail for BRETT A. AMENDOLA:

> I have asked you to please call me rather than texting [ROGER AMENDOLA] asking him once again for his account number. You told me the money was in his account. I need to talk to you. I can see you going down the same path. You don't understand as an outsider what you are,

which is a narcissistic, pathological liar. Brett, you need help. You cannot continue to lie to people.

28.     On January 31, 2019, BRETT A. AMENDOLA purchased casino chips worth $11,100 at the MGM National Harbor Casino. In February 2019, BRETT A. AMENDOLA gambled thousands of dollars at the MGM National Harbor Casino.

*Victim #3*

29.     In mid-2019, Victim #3 learned that BRETT A. AMENDOLA was trying to establish a new hemp farm through Company #1, ROGER AMENDOLA's company. BRETT A. AMENDOLA told Victim #3 that BRETT A. AMENDOLA was in charge of the farm and oversaw the project.

30.     In July 2019, BRETT A. AMENDOLA falsely and fraudulently told Victim #3 that the farm was short on cash because the investors who were going to provide the funding were a little delayed. Victim #3 agreed to make a short-term loan so that the project could continue moving forward while the investors' funding came through. BRETT A. AMENDOLA falsely and fraudulently told Victim #3 that the loan would be repaid within thirty days.

31.     Victim #3 agreed to give his credit card information to ROGER AMENDOLA, who then ran charges on the card to access cash. In or about July 2019, BRETT A. AMENDOLA and ROGER AMENDOLA charged Victim #3's American Express ("AmEx") card a total of $52,583.

32.     On July 24, 2019, BRETT A. AMENDOLA gave Victim #3 a worthless promissory note, which falsely and fraudulently stated that BRETT A. AMENDOLA and Company #1 would pay Victim #3 $57,500 plus $10,000 in interest on August 15, 2019.

33.     Rather than applying Victim #3's funds as promised, BRETT A. AMENDOLA and ROGER AMENDOLA caused the following transactions, among others, on the dates below:

    a.     On July 19, 2019, and July 20, 2019, ROGER AMENDOLA charged $19,155 to Victim #3's AmEx card;

    b.     On July 22, 2019, the payment processor for ROGER AMENDOLA's Company #2 deposited a corresponding amount, $18,484, to Wells Fargo Account #2, which had a balance of $7,641 prior to the deposit;

    c.     On the same day:

        i.     Cash withdrawals totaling $2,300 were made from Wells Fargo Account #2;

        ii.     ROGER AMENDOLA transferred $18,500 from Wells Fargo Account #2 to Wells Fargo Account #1, which had a balance of negative $3,497 prior to receiving the transfers;

        iii.     A $5,500 check to Victim #15 cleared Wells Fargo Account #1; and

        iv.     Cash withdrawals totaling $2,700 were made from Wells Fargo Account #1.

    d.     On July 22 through 25, 2019, BRETT A. AMENDOLA and ROGER AMENDOLA caused the following transactions, among others:

        i.     On July 22, 2019, ROGER AMENDOLA charged $8,900 to Victim #3's AmEx card and a corresponding deposit of

$8,588 was made to Wells Fargo Account #2, which had a balance of $2,314 prior to the deposit;

ii. On July 23, 2019, $7,500 was transferred from Wells Fargo Account #2 to Wells Fargo Account #1, which had a balance of $2,201 prior to the transfer;

iii. On July 23, 2019, cash withdrawals totaling $1,800 were made from Wells Fargo Account #1;

iv. On July 23, 2019, an additional charge of $9,945 was made to Victim #3's AmEx card and a corresponding deposit of $10,369 was made the next day to Wells Fargo Account #2, which had a balance of $1,010 prior to the deposit;

v. On July 24, 2019, $1,600 was withdrawn in cash from Wells Fargo Account #2 and $7,500 was transferred from Wells Fargo Account #2 to Wells Fargo Account #1, which had a balance of $7,873 prior to the transfer;

vi. On July 24, 2019, a $5,800 check that BRETT A. AMENDOLA wrote to Victim Entity #2 and a $2,000 check that BRETT A. AMENDOLA wrote to Victim #2 cleared Wells Fargo Account #1;

vii. On July 24, 2019, a $1,000 wire was sent to Victim Entity #3 and a $2,500 wire was sent to Victim #10 from Wells Fargo Account #1;

viii.     On July 24, 2019, ROGER AMENDOLA charged another $9,650 to Victim #3's AmEx card and a corresponding deposit of $9,312 was made the next day to Wells Fargo Account #2, which had a balance of $2,238 prior to the deposit; and

ix.     On July 25, 2019, $5,800 in cash was withdrawn from Wells Fargo Account #2 and $7,000 was transferred from Wells Fargo Account #2 to Wells Fargo Account #1, which had a balance of $2,013 prior to the transfer. The same day, following the transfer, $2,300 was withdrawn in cash from Wells Fargo Account #1;

e.     On July 29, 2019, ROGER AMENDOLA charged $4,933 to Victim #3's AmEx card, resulting the following day in a corresponding deposit of $4,760 to Wells Fargo Account #2, which had a balance of $773 prior to the deposit.

f.     On July 30, 2019, $4,500 was transferred from Wells Fargo Account #2 to Wells Fargo Account #1, which had a balance of $201 prior to the transfer, and a $2,970 check that BRETT A. AMENDOLA wrote to another individual cleared Wells Fargo Account #1.

*Victim #4*

34.     In late August 2019, BRETT A. AMENDOLA told Victim #4 about Company #1, which BRETT A. AMENDOLA described as an industrial hemp company or farm that BRETT A. AMENDOLA owned with ROGER AMENDOLA. BRETT A.

AMENDOLA falsely and fraudulently claimed that Company #1 had no debt or other investors or owners.  BRETT A. AMENDOLA falsely and fraudulently told Victim #4 that Company #1 had a contract in place to sell its hemp after it was harvested, but that BRETT A. AMENDOLA needed money to complete the harvest and go to market. BRETT A. AMENDOLA also falsely and fraudulently claimed that ROGER AMENDOLA had put $150,000 of his own money into Company #1, but that they needed additional funds to pay for harvest-related expenses.

35.     Victim #4 loaned BRETT A. AMENDOLA and Company #1 more than $50,000.  Initially, BRETT A. AMENDOLA falsely and fraudulently promised to pay $75,000 to Victim #4 after the hemp was harvested in return for the $50,000 loan. Later, BRETT A. AMENDOLA falsely and fraudulently promised Victim #4 a forty-percent ownership interest in Company #1 in addition to the promised $25,000 profit.

36.     BRETT A. AMENDOLA drafted a false and fraudulent contract, which was notarized, that purported to set forth the specifics of the agreement.  The parties involved in the contract were Victim #4, BRETT A. AMENDOLA, ROGER AMENDOLA, Company #1, and Company #3.  In the contract, the owners of Company #1 were identified as ROGER AMENDOLA, with a sixty-percent ownership interest, and Victim #4, with a forty-percent ownership interest.  The contract falsely and fraudulently claimed that ROGER AMENDOLA contributed $150,000 in cash to Company #1.

37.     BRETT A. AMENDOLA falsely and fraudulently promised Victim #4 that the money he loaned to BRETT A. AMENDOLA and Company #1 was only to be spent on Company #1-related harvest and marketing expenses.  BRETT A. AMENDOLA also falsely and fraudulently promised Victim #4 that Company #1 had no debt and that

therefore the money Victim #4 loaned to BRETT A. AMENDOLA and Company #1 would not to be used to repay debt.

38.     On August 29, 2019, BRETT A. AMENDOLA deposited a $2,500 cashier's check from Victim #4 in Wells Fargo Account #1, which had a balance of negative $661 prior to the deposit. The check contained the memo, "LOAN #1 + CASH $4000." The next day, BRETT A. AMENDOLA wired $5,000 from Wells Fargo Account #1 to Victim #3's business.

39.     On September 5, 2019, Victim #13 (Victim #4's brother) wired $7,800 to Wells Fargo Account #1, which had a balance of negative $46 prior to receiving the wire. The same day, BRETT A. AMENDOLA sent Victim #18 a $500 Zelle payment, transferred $500 to Wells Fargo Account #4, and withdrew $300 in cash, all from Wells Fargo Account #1.

40.     On September 13, 2019, Victim #4 wired $12,700 to Wells Fargo Account #1, which had a balance of $3,422 prior to receiving the wire.   On the same day, BRETT A. AMENDOLA caused the following transactions, among others:

   a.     BRETT A. AMENDOLA wrote a $2,000 check from Wells Fargo Account #1 to Victim #2;

   b.     BRETT A. AMENDOLA wrote a $1,500 check from Wells Fargo Account #1 to M&T Bank for the $93,000 loan used to purchase BRETT A. AMENDOLA's 2017 Porsche Panamera; and

   c.     A transfer of $2,000 was made from Wells Fargo Account #1 to Wells Fargo Account #2, which had a balance of $1,036 prior to the transfer.

41.     On September 19, 2019, Victim #4 wired $8,000 to Wells Fargo Account #1, which had a balance of $1,974 prior to receiving the wire.  On the same day, BRETT A. AMENDOLA wrote a $2,500 check to Victim #2 and a $5,000 check to Victim #3 from Wells Fargo Account #1.

42.     On September 25, 2019, Victim #13 wired $7,500 to Wells Fargo Account #1, which had a balance of $1,020 prior to receiving Victim #13's wires.  On the same day, BRETT A. AMENDOLA wrote a $5,000 check to Victim #2 from Wells Fargo Account #1.

43.     From October 2 through 4, 2019, BRETT A. AMENDOLA caused the following transactions, among others:

   a.   Victim #13 wired $17,000 to Wells Fargo Account #1, which had a balance of $250 prior to receiving Victim #13's first wire on October 2, 2019;

   b.   A $3,000 check that BRETT A. AMENDOLA wrote to Victim #3 cleared Wells Fargo Account #1;

   c.   A $10,898 cash withdrawal was made from Wells Fargo Account #1;

   d.   BRETT A. AMENDOLA made a Zelle payment of $500 from Wells Fargo Account #1 to Victim #10; and

   e.   A purchase of $1,219 was made at Best Buy with funds drawn on Wells Fargo Account #1.

*Victim #5*

44.     In July or August 2019, BRETT A. AMENDOLA showed Victim #5 the hemp farm owned by Company #1.  BRETT A. AMENDOLA falsely and fraudulently told

Victim #5 that Company #1 did not have any debt or other investors. BRETT A. AMENDOLA falsely and fraudulently told Victim #5 that he was looking for a short-term investor who could help with Company #1's branding and sales.

45.    On September 12, 2019, Victim #5 wired $8,000 to Wells Fargo Account #1, which had a balance of $89 prior to receiving the wire. On the same day, the transactions made from Wells Fargo Account #1 included a $500 Zelle payment to Victim #18, cash withdrawals totaling $2,800, and a $1,000 transfer to Wells Fargo Account #2.

46.    On September 18, 2019, Victim #5 wired $5,000 to Wells Fargo Account #1, which had a balance of $392 prior to receiving the wire. On the same day, BRETT A. AMENDOLA made a $500 Zelle payment to Victim #10, Zelle payments totaling $2,000 to another individual, and a $1,000 transfer to Wells Fargo Account #2, all from Wells Fargo Account #1.

### *Victim #6 and Victim #7*

47.    In January and February 2020, Victim #6 and Victim #7, who is Victim #6's spouse, lent BRETT A. AMENDOLA $30,000 after BRETT A. AMENDOLA falsely and fraudulently told Victim #6 that he had a CBD business named Company #1 and that he needed money to grow it and buy out a group of investors he had been working with, as he did not want them to obtain an equity interest in the business. After Victim #6 spoke with Victim #7 about investing in Company #1, they decided to lend BRETT A. AMENDOLA $30,000. BRETT A. AMENDOLA falsely and fraudulently promised to use the loan to buy out the investors BRETT A. AMENDOLA had been working with and to repay ROGER AMENDOLA some of the money ROGER AMENDOLA had put into Company #1.

48.     On January 28, 2020, BRETT A. AMENDOLA sent Victim #6 and ROGER AMENDOLA an email providing Company #1's PNC Bank account information and indicating that ROGER AMENDOLA was "100% supporting our efforts and will do what is necessary to guarantee you and [Victim #7] are secured and compensated for the advance."

49.     On February 27, 2020, ROGER AMENDOLA sent Victim #6 and BRETT A. AMENDOLA an email addressed to Victim #6 in which ROGER AMENDOLA falsely and fraudulently stated, in part, "Let this email stand as written documentation, that I agree to amend any paperwork necessary as recommended as per your advisor, as long as the financial terms and conditions do not change. Upon receipt of your transfer today, Thursday February 27, 2020, you will have completed the full investment to [Company #1] as previously agreed and documented, of Thirty Thousand Dollars ($30,000.00). I agree to honor the terms and conditions of the Agreement as previously documented. Yet, should you decide to withdraw your investment, I agree to refund the full amount, plus any interest due, within 14 days of written notice."

50.     BRETT A. AMENDOLA drafted various false and fraudulent documents that purported to set forth the specifics of the agreement with Victims #6 and #7.  One of the documents, a Secured Promissory Note dated January 24, 2020, which was signed by ROGER AMENDOLA, stated that Company #1 would receive $30,000 from Victim #7 and in return Victim #7 would receive monthly interest payments of $2,500 or, at Victim #7's discretion, an additional one percent equity interest in Company #1. The note also provided that the payments to Victim #7 would begin on February 1, 2020, and that unpaid principal, earned interest, or converted equity would be payable in full on January 24, 2021.  A second document, a Binding Memorandum of

Understanding (MOU) signed by ROGER AMENDOLA on January 24, 2020, provided that Victim #7 would invest $30,000 in Company #1 and in return would receive a ten-percent ownership interest in Company #1. Additionally, the MOU provided that Victim #7 would also receive cash distributions of $2,500 or up to a twenty-percent ownership interest in Company #1.

51.     From January 31 through March 3, 2020, BRETT A. AMENDOLA caused the following transactions, among others:

a.      On January 31, 2020, Victim #6 withdrew $15,000 from a PNC Bank account and deposited the funds into PNC Bank Account #1, which had a balance of $25 prior to the deposit. The same day, three withdrawals totaling $9,600 were made from PNC Bank Account #1.

b.      On January 31, 2020, a deposit of $5,000, which matched one of the withdrawals made from PNC Bank Account #1, was made to PNC Bank Account #2, which had a balance of $81 prior to the deposit. The same day, Zelle payments of $500 were made from PNC Bank Account #2 to Victim #10 and another individual.

c.      On February 3, 2020, a Zelle payment of $1,000 was made to Victim #4 from PNC Bank Account #2 and a $2,000 check made payable to Victim #1 cleared PNC Bank Account #2.

d.      On February 3, 2020, cash withdrawals totaling $1,300 were made from PNC Bank Account #1.

e.      On February 10, 2020, a $1,500 check made payable to Victim #2 cleared PNC Bank Account #1.

f.   On February 14, 2020, a $5,000 check drawn on Victim #6's PNC Bank account was deposited into PNC Bank Account #1, which had a balance of $98 prior to the deposit. With the exception of a $300 deposit on February 10, 2020, this was the first deposit made to PNC Bank Account #1 since Victim #6's $15,000 deposit on January 31, 2020.

g.   On February 27, 2020, a $10,000 check drawn on Victim #6's Navy Federal Credit Union account and made payable to Company #1 was deposited into PNC Bank Account #1, which had a balance of $71 prior to the deposit. With the exception of deposits and transfers totaling $950 that were made on February 28, 2020, no additional deposits were made to PNC Account #1 until March 16, 2020.

h.   On March 2, 2020, a $850 check made payable to another one of the defendants' relatives cleared PNC Bank Account #1. The same day, $4,000 was transferred from PNC Bank Account #1 to PNC Bank Account #2, and a Zelle payment was made to Victim #4 from PNC Bank Account #2.

i.   On March 3, 2020, a $1,500 check made payable to Victim #2 cleared PNC Bank Account #1, and Zelle payments of $500 were made to Victim #4 and Victim #10 from PNC Bank Account #2.

*Victim #8*

52.   In the spring of 2020, Victim #8 transferred $21,142 from his TD Ameritrade account to ROGER AMENDOLA's TD Ameritrade Account.

53.     BRETT A. AMENDOLA had falsely and fraudulently told Victim #8 that he could grow Victim #8's $21,000 to $30,000 in two weeks.  After two weeks, BRETT A. AMENDOLA falsely and fraudulently told Victim #8 that BRETT A. AMENDOLA could give Victim #8 $30,000, but that if Victim #8 let BRETT A. AMENDOLA keep trading with the money, BRETT A. AMENDOLA could grow it to $100,000.

54.     From April 29 through May 4, 2020, BRETT A. AMENDOLA caused the following transactions, among others:

a.     On April 29, 2020, a transfer of $21,141 was made from Victim #8's TD Ameritrade account to ROGER AMENDOLA's TD Ameritrade Account, which had a closing value of $30,044 on April 30, 2020, the day after Victim #8's transfer was received.

b.     On May 1, 2020, a $20,000 wire was sent from ROGER AMENDOLA's TD Ameritrade Account to United Bank Account #3. By May 31, 2020, withdrawals and losses had reduced the value of ROGER AMENDOLA's TD Ameritrade Account to negative $0.86.

55.     United Bank Account #3 had a balance of $6,050 prior to receiving the $20,000 wire from ROGER AMENDOLA's TD Ameritrade Account on May 1, 2020.  On the same day that the wire was received, $3,700 in cash was withdrawn from United Bank Account #3 and a $10,000 check, made payable to ROGER AMENDOLA and drawn on United Bank Account #3, was deposited in PNC Bank Account #2, which had a balance of $553 prior to the deposit.

56.     On May 4, 2020, the transactions made from PNC Bank Account #2 included a $2,000 electronic payment to Victim #9 and three electronic payments totaling $5,750 to two other individuals.

*Other Victims*

57.     Through similar false and fraudulent statements, representations, and promises, BRETT A. AMENDOLA and ROGER AMENDOLA perpetrated the *Ponzi* scheme against other victims, including Victim #9, Victim #10, Victim #11, Victim #12, Victim #13, Victim #14, Victim #15, Victim #16, Victim #17, Victim #18, Victim #19, Victim #20, Victim #21, Victim Entity #1, Victim Entity #2, and Victim Entity #3.

THE PAYCHECK PROTECTION PROGRAM

58.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic hardships caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").  In April 2020, Congress authorized over $300 billion in additional PPP funding.

59.     In order to obtain a PPP loan, the small business (through its authorized representative) must state, among other things, its average monthly payroll expenses and number of employees.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

60.     A PPP loan application must be processed by a participating financial institution (the lender).  If a PPP loan application is approved, the lender funds the PPP loan using its own monies, which are one hundred percent guaranteed by Small Business Administration (SBA).  Data from the application, including information about

the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

61.    PPP loan proceeds must be used by the business on certain permissible expenses—such as payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on qualified expense items within a designated period of time (usually eight weeks of receiving the proceeds) and uses at least seventy-five percent of the PPP loan proceeds on payroll expenses.

*Company #1's Fraudulent PPP Loan*

62.    In April through June 2020, Company #1 obtained an SBA-backed PPP loan of $43,292 (loan number x7802). The approval and subsequent funding of this loan was based on false information provided to the loan originator, Square Inc., d/b/a Square Capital LLC, and by extension, to the lender, Celtic Bank, an SBA 7(a) lender and FDIC-insured financial institution, and to the SBA.

63.    To apply and obtain Company #1's PPP loan, BRETT A. AMEDNDOLA and ROGER AMENDOLA caused false and fraudulent information to be submitted to the loan originator, and by extension, to the lender and to the SBA. These included false and fraudulent copies of an IRS Form 941 (Employer's Quarterly Federal Tax Return) for the first quarter of 2020 and a 2019 IRS Form 940 (Employer's Annual Federal Unemployment Tax Return). These tax documents falsely stated that Company #1's payments to employees totaled $47,000 during the first quarter of 2020 and $179,210 in 2019.

64.    On April 21, 2020, the United States Treasury wired a $6,000 advance of the proceeds of loan number x7802 to PNC Account #1, which had a balance of $150

-24-

prior to receiving the wire. The same day, $6,000 was transferred from PNC Account #1 to PNC Account #2, which had a balance of $14 prior to receiving the transfer. This transfer was followed on the same day by a $3,400 wire from PNC Account #2 to ROGER AMENDOLA's TD Ameritrade Account.

65.     On June 3, 2020, the remaining proceeds of loan number x7802 were wired by the lender to PNC Account #1, which had a balance of $28 prior to receiving the wire. The same day, $36,000 was transferred from PNC Account #1 to PNC Account #2, which had a balance of $219 prior to receiving the transfers. This transfer was followed on the same day by a $5,000 withdrawal from PNC Account #2 and a $29,000 wire from PNC Account #2 to ROGER AMENDOLA's Charles Schwab Account.

*Company #2's Fraudulent PPP Loan*

66.     In June 2020, Company #2 obtained an SBA-backed PPP loan of $45,729 (loan number x7901). The approval and subsequent funding of this loan was based on false information provided to the loan originator, Square Inc., d/b/a Square Capital LLC, and by extension, to the lender, Celtic Bank, an SBA 7(a) lender and FDIC-insured financial institution, and to the SBA.

67.     To apply and obtain Company #2's PPP loan, BRETT A. AMENDDOLA and ROGER AMENDOLA caused false and fraudulent information to be submitted to the loan originator, and by extension, to the lender and to the SBA. These included false and fraudulent copies of an IRS Form 941 for the first quarter of 2020 and a 2019 IRS Form 940. These tax documents falsely stated that Company #2's payments to employees totaled $59,875 during the first quarter of 2020 and $239,500 in 2019.

68.     On June 17, 2020, the proceeds of loan number x7901 were wired by the lender to PNC Account #2, which had a balance of $111 prior to receiving the wire. This

-26-

wire was followed on the same day by a $29,400 wire from PNC Account #2 to ROGER AMENDOLA's Charles Schwab Account.

COUNT ONE

*Conspiracy To Commit*
*Wire Fraud, Bank Fraud, and False Statements – 18 U.S.C. §§ 371 and 1349*

THE GRAND JURY FURTHER CHARGES THAT:

Paragraphs 1 through 68 of the General Allegations are incorporated here by reference.

From at least in or about April 2017 through August 2020, in the Eastern District of Virginia and elsewhere, the defendants,

BRETT A. AMENDOLA and ROGER AMENDOLA,

together with others known and unknown, knowingly and intentionally conspired:

    (a)    To violate 18 U.S.C. § 1343, that is, having devised and intending to devise any scheme or artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations, and promises, to transmit and to cause to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice – and the defendants knowingly and intentionally attempted to do so;

    (b)    To violate 18 U.S.C. § 1344, that is, to knowingly execute and attempt to execute a scheme or artifice to defraud a financial institution, and to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false and fraudulent pretenses, representations, and promises – and the defendants knowingly and intentionally attempted to do so; and

(c)     To violate 18 U.S.C. § 1014, that is, to knowingly make, for the purpose of influencing the action of an institution the accounts of which were insured by the Federal Deposit Insurance Corporation, a false statement and report upon an application, commitment, and loan.

(In violation of 18 U.S.C. §§ 371 and 1349).

COUNTS TWO THROUGH SEVEN

*Wire Fraud – 18 U.S.C. § 1343*

THE GRAND JURY FURTHER CHARGES THAT:

Paragraphs 1 through 68 of the General Allegations are incorporated here by reference.

On or about the dates below, in the Eastern District of Virginia and elsewhere, the defendants,

BRETT A. AMENDOLA and ROGER AMENDOLA,

aided and abetted by themselves and others known and unknown, having devised and intending to devise any scheme or artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, each such execution constituting a separate count:

| Count | Victim | Approximate Dates |
|-------|--------|-------------------|
| TWO | Victim #1 | October 2018 through January 2019 |
| THREE | Victim #2 | November through December 2018 |
| FOUR | Victim #3 | July 2019 |
| FIVE | Victim #4 | August through October 2019 |
| SIX | Victim #5 | July through September 2019 |
| SEVEN | Victim #6 & Victim #7 | January through March 2020 |

(In violation of 18 U.S.C. §§ 1343 and 2).

## COUNTS EIGHT AND NINE

### *Bank Fraud – 18 U.S.C. § 1344*

THE GRAND JURY FURTHER CHARGES THAT:

Paragraphs 1 through 68 of the General Allegations are incorporated here by reference.

From at least in or about April 2020 through June 2020, in the Eastern District of Virginia and elsewhere, the defendants,

### BRETT A. AMENDOLA and ROGER AMENDOLA,

aided and abetted by themselves and others known and unknown, knowingly executed and attempted to execute a scheme or artifice to defraud a federally-insured financial institution, as defined in 18 U.S.C. § 20, that is, Celtic Bank, and to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of Celtic Bank by means of false and fraudulent pretenses, representations, and promises, each such execution constituting a separate count:

| Count | Borrower | Loan Amount |
|-------|----------|-------------|
| EIGHT | Company #1 | $43,292 |
| NINE | Company #2 | $45,729 |

(In violation of 18 U.S.C. §§ 1344 and 2).

COUNTS TEN THROUGH THIRTEEN

*False Statements to a Financial Institution – 18 U.S.C. § 1014*

THE GRAND JURY FURTHER CHARGES THAT:

Paragraphs 1 through 68 of the General Allegations are incorporated here by reference.

From April through June 2020, in the Eastern District of Virginia and elsewhere, the defendants,

BRETT A. AMENDOLA and ROGER AMENDOLA,

aided and abetted by themselves and others known and unknown, knowingly made and attempted to make a false statement and report for the purpose of influencing the action of Celtic Bank, an institution the accounts of which are insured by the Federal Deposit Insurance Corporation, upon an application and loan, in that the defendant knowingly made statements and reports that falsely stated the amounts of payments made to employees for Company #1 and Company #2 during 2019 and 2020, and submitted fraudulent tax documents in support of these false statements and reports, each such false statement and report constituting a separate count:

| Count | Borrower | False Statement of Payments to Employees |
|---|---|---|
| TEN | Company #1 | $47,000 |
| ELEVEN | Company #1 | $179,210 |
| TWELVE | Company #2 | $59,875 |
| THIRTEEN | Company #2 | $239,500 |

when in truth and in fact, as the defendants well knew, these statements, reports, and tax documents were false and fraudulent.

(In violation of 18 U.S.C. §§ 1014 and 2).

NOTICE OF FORFEITURE

Defendants BRETT A. AMENDOLA and ROGER AMENDOLA are hereby notified, pursuant to FED. R. CRIM. P. 32.2(a), that upon conviction of the violation set forth in Count 1 of this Superseding Indictment, they shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2)(A), as well as 28 U.S.C. § 2461(c), any property constituting, or derived from, proceeds obtained directly or indirectly as the result of the violation.

The defendants are further notified, pursuant to FED. R. CRIM. P. 32.2(a), that upon conviction of any of the violations set forth in Counts 2 through 7 of this Superseding Indictment, they shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), as well as 28 U.S.C. § 2461(c), any property, real or personal, that constitutes or is derived from proceeds traceable to the violation.

The defendants are further notified, pursuant to FED. R. CRIM. P. 32.2(a), that upon conviction of the violations set forth in Counts 8 through 13 of this Superseding Indictment, they shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly as the result of the violation.

Pursuant to 21 U.S.C. § 853(p), the defendants shall forfeit substitute property, if, by any act or omission of the defendants, the property referenced above cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

(All in accordance with 18 U.S.C. §§ 981(a)(1)(C) & 982(a)(2)(A); 21 U.S.C. § 853(p); 28 U.S.C. § 2461(c); and FED. R. CRIM. P. 32.2.)

A TRUE BILL:

Pursuant to the E-Government Act,
The original of this page has been filed
under seal in the Clerk's Office

_____
FOREPERSON


JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____
James P. Gillis
Amanda B. Lowe
Assistant United States Attorneys
Chase Harrington
Special Assistant United States Attorney

-33-